# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**MICHAEL L STANDLEY** and
**JACQUELINE T STANDLEY**,

Debtors.

Case No.  **11-62373-12**

# MEMORANDUM OF DECISION

At Butte in said District this 7th day of December, 2012.

Pending in this Chapter 12 case is a portion[1] of the Debtors' Motion for Valuation (Docket No. 46) of security of The State Bank of Townsend ("State Bank"), and State Bank's objection thereto.  A hearing on Debtors' Motion was held at Great Falls on October 12, 2012. The parties appeared represented by counsel.  Testimony of witnesses was heard and appraisals and other exhibits were admitted by stipulation of counsel.  At the conclusion of the hearing the Court granted the parties time to file briefs, which have been filed and reviewed along with the record and applicable law.  This matter is ready for decision.  For the reasons set forth below, the valuation of State Bank's security and amount of its allowed claim secured by Debtor's real property known as the "Home Place"[2] is fixed at the amount of $650,000.

---

[1]The parties agree that two parcels of State Bank's security are to be surrendered, leaving the "Home Place" for valuation as State Bank's remaining security.

[2]The "Home Place" is described on the second page of Ex. 1 as real property located in Township 19 North, Range 2 East, M.P.M., Sections 28, 29, and 33, and Township 18 North, Range 2 East, M.P.M., Section 9, Cascade County, Montana, consisting of approximately 783.75 deeded acres, more or less, with no buildings of value on the subject property.

1

This Court has jurisdiction of this Chapter 12 case under 28 U.S.C. § 1334(a).  Allowance of State Bank's secured claim is a core proceeding under 28 U.S.C. § 157(b)(2).  At issue is the valuation of Debtors' "Home Place" in Cascade County, Montana, which is the remaining security for State Bank's Proof of Claim No. 10, and whether the valuation should be limited by the Debtors' agricultural use of the Home Place rather than the "Highest and Best Use" utilized by the appraisers in arriving at their appraised valuations.  This Memorandum includes the Court's findings of fact and conclusions of law.

Debtor Michael Standley ("Michael") appeared and testified at the October 12, 2012, hearing, represented by Debtors' attorney Gary S. Deschenes ("Deschenes") of Great Falls.  State Bank was represented by attorney John H. Grant ("Grant") of Helena, and State Bank's president Michael Richter testified.  U.S. Bank, National Association, was represented by attorney Randall C. Lester of Great Falls.  The Chapter 12 Trustee James D. Volk appeared.  Exhibits ("Ex.") 1, A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V, W, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH, II, JJ, KK, LL, MM, NN, OO, all were admitted into evidence by stipulation.  Also appearing and testifying were certified real estate appraisers Ralph "Rick" Gourley ("Gourley") of Gourley & Company of Great Falls, and Steve Urick ("Urick") of Stanford, Montana.  Other witnesses who testified were Debtors' consultant J.T. Korkow ("Korkow") and Chase Ragen ("Ragen").

### FACTS & PROCEDURAL HISTORY

Michael and Jacqueline Standley (together "Standleys" or "Debtors") live at 1131 River Road in Cascade County, Montana.  Their house is on a parcel which is not part of the Home Place but is contiguous.  Michael raised cattle on his property since 1986, including on the Home

2

Place.  He also works full time with the Air National Guard.

**The Home Place**.

Urick's appraisal, Ex. KK, describes the location of Home Place as 12 miles northeast of Cascade, Montana.  Michael testified that the Home Place is located in Castner Coulee on Castner Creek, south of the Missouri River.  Urick testified that one end of the Home Place is within half a mile from the river bottom, and that one can see the river from parts of the property.

The Home Place is approximately 783.75 acres in size, divided into two (2) noncontiguous tracts, both of which primarily are used for livestock production.  Tract 1 also is used for limited dry crop production.  The Home Place has about one hundred feet of elevation change in the coulee.  Its soil is sandy and rests on bedrock.

Tract 1 of the Home Place is a larger parcel of about 703.75 acres.  Tract 2 is an 80-acre parcel located 1.75 miles south of Tract 1.  Gourley's appraisal, Ex. 1, describes the Home Place as in "below average condition" due to weeds, the condition of fences, and the need for sources of stock water and road construction.  Ex. 1, p. 39.  Urick testified that both tracts have coulees, and that Michael told him water runs down the coulee 8 months out of the year.  In addition there are several water springs on the Home Place, although they need work.

River Road is a county road which runs through an 80 acre parcel within the Home Place. Urick testified that there is an old building and garage on a 2 acre parcel located right after the turn off River Road.  Urick's appraisal, Ex. KK, states that there are no improvements of value on the subject property.  Ex. KK, p. 34.  It states that the old dwelling and garage on the building site are in fair or poor condition and would be of no significant value to a potential buyer.  There is a second access road made of dirt and gravel, which runs uphill about a mile to the Debtors'

3

dwelling, which is not part of the Home Place[3].  A water well is located on the Site near Debtors'

dwelling[4] which Urick testified was approximately 200 feet deep, and he assumed that other

wells could be drilled on the Home Place, and 1 or 2 springs could be developed.

Another approximately 300 acres is located above Debtors' residence.  Michael testified

that no recorded easement or other legal access exists to the upper site, and that road is not open

during the winter.  Under cross examination he clarified that he both owns the Home Place and

has a recorded easement up to his homesite.  Urick testified that the 16 acre home "Site" has no

legal access, and that Debtors' access was through their neighbors' property with their consent.

However, under cross examination Urick allowed that there could be "steep access" to the Site

coming down the coulee.

Urick testified that he classified a field "on top," beyond Debtors' dwelling, of

approximately 95 acres as pasture and "hay land," which he said he would not call cropland, and

another 80 to 90 acres as what he would call cropland, for a total of 170 acres of hay land.

Michael testified that 15 acres of the Home Place is not useable because there is a cliff,

and the 80 acre tract located 2 miles south of his main ranch is landlocked with no legal easement

or access.  Gourley also testified that the access to the bluff overlook is difficult, and only

possible by crossing the neighbor's land.  Michael testified that he has access to the 80-acre Tract

---

[3]Gourley's appraisal, Ex. 1, explains in a note at the top of page 18 that an approximately 16.25 acre "Site" located in Castner Coulee near the middle of Tract 1, has been surveyed out and is not considered a part of Tract 1.  Debtors' residence and outbuildings are located on the Site.

[4]Urick was asked whether there was a well on the Home Place.  He answered "yes," but referred to the 16-acre Site where the Debtors live.  Gourley and Michael testified that the Site is not part of the Home Place.

2 by permission of the neighboring landowner, but no written agreement exists.  Gourley

concurred and testified that access to the bluff is physically difficult because of the sharp drop

off.  Ex. 1, p. 32.

Michael testified that he still uses the 80 acre parcel, but that no one is using it to raise

cattle.  Michael testified that 50 acres are located on the creek bottom in the Home Place that can

be farmed, as he had previously seeded and hayed that 50 acres, but that now "it's a weed patch"

which Michael no longer considers cropland.  Gourley testified that none of the Home Place

north of River Road is used because of the steep slope.

Michael testified that he raised up to 700 head of cattle on his land and leased land in

2006 to 2008, but that he owns no cattle at present.  He sold all his cattle and paid the proceeds to

State Bank.  Chase Ragen works for Farm & Ranch Credit Services, which assists clients in farm

plan preparation and FSA programs.  He testified that the Standleys have been his clients since

2004, and that he figured that the Home Place could support 80 head of cows, and could produce

150 tons of hay.[5]

Michael testified that he has never allowed outfitting on the Home Place.  He and

Gourley both stated that there are deer on the Home Place.  Under cross examination, however,

Michael admitted that he leased his property to hunters for a "nominal fee," which he then

testified was in the amount of $1,500 for rights to hunt the Home Place/coulee and other parcels.

Ragen testified that Debtors' history shows income from hunting leases.  On rebuttal, Michael

testified that he leased hunting rights to two doctors, but that Debtors will not use the Home

---

[5]Michael testified that he was told several times by Ragen that because of the value of his
cattle, Michael could get out of the loans without selling any land.  This evidence is irrelevant to
this contested matter.

5

Place for hunting leases if they use it for agricultural purposes.

In his appraisal Urick described the recreational amenities of the Home Place, noting good views of the river bottom area and views of the Little Belt Mountains, water, riparian vegetation, and good brush cover for wildlife habitat. Ex. KK, p. 34. Urick described Castner Coulee as "a significant recreational asset."

Michael testified that he listed two parcels of real property for sale, including 160 acres he listed in 2010 for $2,000 per acre, but received no offers. Michael testified that a land development located next to the 160 acre parcel had trouble selling houses. He did not lower that listing price because the secured creditor, Zion Bank, would not have been paid in full at the lower price. A second parcel of 316 acres was listed for sale at $1,700 per acre, and Standleys reduced the listing price to $1,200. Michael testified that he received one offer for the 316 acre parcel at $500 per acre. He also stated that his neighbor offered him $500 per acre for his creek land.

Gourley testified that a limited pool of buyers exist for the Home Place, which is further shrunk because of the nearby 780 acre development. Gourley testified that the 780 acre development is a big problem in marketing the Home Place, as Cascade County does not lend itself to development. Gourley further testified that landowners in Cascade County do not want access running through their building sites.

**Debtors' Loans from State Bank.**

Richter is the president and CEO of State Bank, which loaned money to the Standleys

secured by their real property, including the Home Place, and chattels[6].  Richter testified that Debtors have three (3) loans from State Bank, including an operating loan, that the 3 loans are cross collateralized, and that the total outstanding balance owed on the 3 loans shown by Ex. NN as of October 12, 2012, is $810,412.91.  Debtors have made no payments to State Bank on any of the 3 loans since 2011.  It appears that State Bank's mortgages are junior to a mortgage held by Zion's Agricultural Finance.

**Debtors' Chapter 12 Bankruptcy Case**.

Debtors filed their Chapter 12 petition on December 29, 2011, and filed their Schedules and Statement of Financial Affairs on January 23, 2012.

They filed their application to employ J.T. Korkow and his firm Powder River Ag Consulting, LLC, as "consultants" on March 20, 2012.  The application (Dkt. 26) states that the purposes of Korkow's employment included to determine Debtors' financial condition, assist with cash flow projections and feasibility analysis for their chapter 12 plan, and provide expert testimony with respect to the appropriate market rate of interest for holders of secured claims, and restructuring terms.  Nothing in the application to employ Korkow suggested that he would testify as an expert regarding the valuation of the Debtors' real property.  The Court approved the application to employ Korkow on March 21, 2012.

Debtors filed their Chapter 12 Plan (Dkt. 29) on March 28, 2012, proposing to make payments to the Trustee beginning December 31, 2012, and thereafter each year through 2014. The Plan and attachments include income projections showing income from share cows, the sale

---

[6]Deschenes stated at the hearing that Debtors and counsel for State Bank Grant stipulate that the value of State Bank's chattel security is $43,000.

of real property, social security, wages, government payment, and $15,000 in "Rock Sales" in 2012. Michael testified that the gravel income was to be from their property known as the Nichols Place. Since filing the Plan, Debtors determined that they would retain only the Home Place.

Michael testified that their Plan provides for running 80 cows on shares, and for the sale of certain real property to Debtors' son. He testified that in order to run 80 cows he would have to lease more land and buy hay. The expense projections attached to Debtors' Plan, however, have a blank space next to "Lease/Rent[7]." Debtors' counsel suggested that Debtors could lease additional property to run cattle, but Ragen testified that he did not see a lease payment in Debtors' Plan. Asked about their hay acreage, Michael testified that the 230 acres of harvested hay included all 3 of their properties.

Paragraph 2 of the Plan provides for payments to secured claims, including State Bank as holder of three (3) secured claims secured by real estate and chattels. Objections to confirmation were filed by creditors including State Bank.

State Bank filed its Proof of Claim No. 10 on April 26, 2012, asserting a fully secured claim in the amount of $774,645.12, secured by real estate, motor vehicles and other collateral which Claim 10 states has a total value in the amount of $1,425,000. No objection has been filed to allowance of State Bank's Proof of Claim.

Debtors filed their Motion for Valuation of State Bank's Security on June 22, 2012, requesting that State Bank's claim secured by real estate and improvements be valued in the

---

[7]Michael admitted on recross examination that there are errors in Debtors' projections which he should correct.

8

amount of $765,000.00 pursuant to 11 U.S.C. § 506(a).  State Bank filed an objection on June 28, 2012, asserting that their secured includes personal property in addition to real property and improvements, and that the value of its security is not less than $1,425,000.  Urick's appraisal, Ex. KK, is the basis for State Bank's valuation and is based on 3 parcels of Debtors' property, including the Home Place.

Debtors filed on July 3, 2012, an application to employ Gourley as real estate appraiser to appraise their real property.  The Court approved the application on July 6, 2012.  Gourley's appraisal of the Home Place, Ex. 1, was submitted on September 4, 2012.  On September 20, 2012, Debtors filed an application to pay Gourley $5,250 for his appraisal.  No objection was filed, and on October 10, 2012, the Court awarded Gourley an appraiser fee in the sum of $5,250. At the hearing on October 12, 2012, however, Debtors announced that they disagreed with Gourley's appraisal.  Notwithstanding, they proceeded to call Gourley to testify and offered his appraisal into evidence.

**Michael Standley's Value Testimony.**

Michael is an owner of the Home Place.  He admitted that he is not in the real estate business and has had no training as an appraiser.  Michael testified that the value of the Home Place is approximately $400 to $500 per acre, which works out to between $313,500 to $391,875 for the 783.75 acres.  He testified that the Home Place has bad fences and other problems which he does not have the money to repair and maintain.

**Rick Gourley's Appraisal & Value Testimony.**

Gourley is a licensed and certified real estate appraiser, and a licensed real estate broker. He testified that he has been a real estate broker and appraiser since 1983.  Gourley was

9

employed by the Debtors to appraise their real property.  Ex. 1 is Gourley's appraisal of the

Home Place.  However, at the hearing Debtors' counsel stated that the Debtors do not accept

either Gourley's appraisal of the Home Place, or Urick's appraisal.

On pages 7 and 38 Gourley states that the "Highest and Best Use" of the Home Place is:

"As an add-on/part-time agricultural tract, recognizing there are nonagricultural amenities

included in the subject property that may affect value and enlarge the pool of buyers."  Gourley

explained that he came up with ag use, but that testified that the small size of the Home Place

indicated that it would be more appropriate for an add-on tract for a neighbor, or for a part-time

owner.  He testified that nonagricultural amenities are anything that does not affect the ag use,

including recreation, and can affect the valuation.   He emphasized that his appraisal is not

limited to just "ag use."

Gourley considered all three approaches to value, i.e., (1) Earnings or Income

Capitalization Approach; (2) Market Date or Sales Comparison Approach; and (3) Cost

Approach.  But in his appraisal Gourley valued the property utilizing the Sales Comparison

Approach.  In Ex. 1, p. 40, Gourley explained that, in his opinion, the Income Capitalization

Approach to value "should be viewed as inconclusive in the appraisal of the subject property."

He did not complete the Cost Approach because it would have been redundant to the Sales

Comparison Approach because, he explained, no improvements of value exist to be included in

the subject property and the same comparable sales selected for use in the Sales Comparison

Approach would be used in the Cost Approach.  Ex. 1, p. 39.

Gourley examined seven comparable sales of land in Cascade County which occurred in

2011 and 2012 with per-acre values ranging from $576 to $1,311, and discusses other sales of

10

which he was aware.  Gourley wrote at page 60 of Ex. 1 that Sales 1, 2, and 6 furnish the most

reliable range of value for the subject property.  Based on the exclusion of the Debtors' home

Site, and the need to replace the Site's water source and a new road to the property south of the

Site, and the below average condition of the site and reduced aesthetics, Gourley estimated the

value of the Home Place at $800 per acre, which is between the values of comparable sales 1

($576/acre) and 6 ($616/acre), and Sale 2 ($875/acre).  Ex. 1, p. 60.  Gourley testified that in his

opinion the nonagricultural amenities such as the creek and the view made the Home Place value

per acre worth more than Sales 1[8] and 6.  Ex. 1 states Gourley's opinion of the value of the Home

Place as of August 3, 2012, at pages 2 and 60 in the amount of $627,000.

**Steve Urick's Appraisal & Value Testimony.**

Urick is a licensed and certified real estate appraiser in the State of Montana, and a

rancher near Stanford in Cascade County.  He testified that he has been an appraiser for 25 years

and has performed approximately 500 real estate appraisals of more than 2 million acres of land.

He also has background in agricultural lending.  He testified that as an appraiser he is required to

complete 39 hours of classes of continuing education every 2 years.  He performs exclusively

farm and ranch appraisals.

Urick prepared an appraisal of 1,684.75 acres located in 3 parcels[9] of Standleys'

properties, including the Home Place, dated February 21, 2012.  Ex. KK is Urick's appraisal,

which he prepared after meeting with Michael and driving over the Home Place and other

---

[8]On cross examination, Urick testified that Sale 1at $576 was inferior to the Home Place.

[9]The other 2 parcels are the "Prairie Place" comprised of 316.43 acres located 8 miles
northeast of Cascade, and the "Nichols Place" comprised of 584.57 acres located 6 miles
northeast of Cascade.  Ex. KK, pp. 29-30.

properties. Urick testified that no change in the real estate market has occurred from Ex. KK's date of February 21, 2012, to the hearing date for purposes of determining the value of Debtors' property. In Ex. KK Urick concluded at page 1 that the value of the Debtors' land and improvements was $1,425,000 for all three parcels.

At page 37 of Ex. KK, Urick stated that the Highest and Best Use of the Debtors' properties is: "Livestock grazing and dryland cropland with some positive recreational influence." On cross examination, Urick testified that the properties would not necessarily be purchased by an agricultural buyer, but could rather be bought by a recreational buyer or a speculator.

Urick calculated values for the Home Place under all three methods – Cost Approach, Income Approach and Sales Comparison Approach. However, he testified that he emphasized the Cost Approach and Sales Approach more than the Income Approach.

Urick's appraisal discusses his Income Approach valuation at pages 46-47 of Ex. KK. Under the income approach, as explained in Ex. KK, net operating income is calculated by deducting expenses from estimated total income which the property would bring on a cash rent basis. Next, a capitalization rate is determined from comparable sales. Urick used a 1.2% capitalization rate after comparing the percentage of cropland for Debtors' properties with 3 comparable sales. Using a net operating income ("NOI") of $15,632, Urick divided NOI by 1.2% and arrived at an indicated value under the income approach which he rounded up to $1,305,000. Ex. KK, p. 47. Under cross examination by Debtors' attorney, Urick testified that he calculated the value under the Income Approach for all 3 of Debtors' properties, using the Debtors' statements of use. He disagreed with Deschenes' attempt during cross examination to

12

calculate of value under the Income Approach, and testified that Deschenes was using conservative cattle numbers[10].

Urick did not apportion the Home Place value under the Income Approach from the total value at the hearing. Calculating the Home Place value based on its percentage of the total acreage in Ex. KK, the Court arrives at a Home Place Value under the Income Approach in the amount of $613,350[11].

At page 44 of Ex. KK, under the Cost Approach Urick stated the value of the main portion of the Home Place as $1,075 per acre, and $600 per acre for the 80 acre tract[12]. At the hearing Urick testified that the market value of the Home Place would be reached by taking 99.65% of both per-acre values and multiply that by the acreage. He testified that he arrived at the 99.65% factor after considering factors such as location, water, access, terrain, quality and recreational features.

Urick testified that he considered 7 comparable sales for his Cost Approach calculation, which range from $487/acre (Sale 5) to $1,200/acre (Sale 2). Ex. KK, p. 43. Urick testified that he assigned the most weight to comparable Sales 1 ($985/are) and Sale 2 ($1,200). Under cross examination, Urick testified that he considered other sales at lower prices, including Sale 5 at

_____

[10]Deschenes' calculation under the Income Approach is attorney argument, not evidence, and Urick did not agree with Deschenes' calculation.

[11]The Home Place acreage (784.75) divided by the total acreage in Ex. KK (1,684.75) is .47, or 47%. 47% of $1,305,000 gives a value for the Home Place under the Income Approach in the amount of $613,350.

[12]Urick arrived at a "blended land value" of $850/acre for all three properties under the cost approach. Ex. KK, p. 44.

$487/acre, but repeated that he put more emphasis on Sales 1 and 2[13].

Urick assigned a $1,075/acre value for the main portion of the Home Place because Sales 1 and 2 were most similar in overall quality to the main portion of the Home Place.  Ex. KK, p. 44.  He valued the 80 acre tract of the Home Place significantly lower at $600 because of the lack of legal access.  Ex. KK, p. 44.

Urick testified that he included the recreational influences of comparable properties in arriving at his valuations, and that if the Debtors wanted to purchase the Home Place they the value of the recreational aspects would be included in the price.  Under Urick's Cost Approach, the value of the 703.75 acre Tract 1 of the Home Place is $1,071.24 multiplied by 703.75, or $753,885.15[14].  The value of the 80 acre separate tract is 80 acres multiplied by $597.90, or $47,832.00[15], and the total value is $801,717.15.

In Urick's calculation of value under the Sales Comparison approach he looked at 4 sales which took place in 2011 at prices ranging from $626 to $1,063/acre.  Ex. KK, p. 48.  He testified that he used some of the same comparable sales as Gourley used, and he explained Gourley's lower valuation as an emphasis by Gourley on the lower comparable sales.

Urick adjusted the value for the 80 acre parcel of the Home Place down $5/acre because of the lack of access.  Ex. KK, p. 49.  After other adjustments, Urick concluded that the blended value of the Debtors' real estate under the Sales Comparison Approach is $840/acre, which

---

[13]Urick noted that Sale 2 was purchased at $1,200/acre by the adjoining landowner who wanted to protect his access to his own land.

[14]$1,075 x 99.65% = $1,071.24.  Multiplying $1,071.24 x 703.75 acres = $753,885.15.

[15]$600 x 99.65% = $597.90.  Multiplying $597.90 x 80 acres = $47,832.00.

14

works out to $658,350 for the Home Place.[16]

Reconciling the values under the 3 approaches, Urick arrived at an opinion of the market value of Debtors' property of $1,425,000, 47% of which produces a value for the Home Place in the amount of $669,750.  Ex. KK, p. 53.  Urick explains at p. 53 that he placed less emphasis on the Income Approach because a small change in the cap. rate can cause a significant change in the total value, and because buyers of grazing properties with recreational influence do not place as much emphasis on the rate of return.  Urick found both the Cost Approach and Sales Comparison Approach more helpful, and placed slightly more emphasis on the Cost Approach value, which the Bank calculates as a value for the Home Place of $801,556.25.

**J.T. Korkow's Value Testimony**.

Korkow testified that he has had extensive experience in banking, and works as a real estate broker in Broadus, Powder River County, in eastern Montana.  He admitted that he has not sold or listed real property in Cascade County, and he admitted that property markets vary in different parts of Montana.

Korkow testified that he was certified in the late 1980's and 90's by the United States government in appraisal techniques, but that his certification was pulled in 1991 or 1992 and he has not been certified for more than 20 years.  He admitted that he has not taken any appraisal courses recently.  Korkow was employed by the Debtors as a professional to be a consultant for their reorganization.  Debtors' application to employ Korkow did not disclose that he would be

---

[16]$840/acre x 783.75 acres = $658,350.

performing a valuation.  Notwithstanding, Debtors asked Korkow during direct examination[17] his opinion of the value of the Home Place based on the Income Capitalization Approach.

Korkow testified that he arrived at a value for the Home Place under the Income Capitalization Method, which Debtors' brief states as $304.09 per acre.  He explained that he arrived at that value assuming $5,400 in annual income from the Home Place based on carrying capacity of 40 cow/calf pairs, from interviews with the Debtors and review of their tax returns. Korkow used the same capitalization rate as Urick used, which he said was derived from comparable sales in the area.  Korkow agreed under cross examination that if the numbers he was given by the Debtors were wrong then his calculation of the value of the Home Place under the Income Approach would be wrong.

## DISCUSSION

### I. Contentions of the Parties.

Debtors' attorney argued at the hearing that the Court should value the Home Place at between $450 to $500 per acre[18] because the Home Place is agricultural property and they are using it as agricultural property only.  Because of the access problems and Debtors' use, he argued, the Court should use Debtors' proposed value and disregard the market values determined by their appraiser Gourley, and by Urick.

Debtors' brief cites three decisions entered by this Court in 1987: *In re Robinson Ranch,*

---

[17]State Bank objected on the grounds of lack of foundation.  The Court allowed Korkow to testify as to the value of the Home Place under the Income Capitalization Approach based on his testimony that he has had significant experience in the methodology.

[18]At $450/acre the value of the Home Place would be $352,687.50.  At $500/acre the value would be $391,875.00.

*Inc.*, 75 B.R. 606 (Bankr. D. Mont. 1987); *In re Foster*, 79 B.R. 906 (Bankr. D. Mont. 1987); and *In re Cool*, 81 B.R. 614 (Bankr. D. Mont. 1987). Debtors contend that their proposed use of the Home Place as ag land should be utilized in arriving at a valuation, rather than speculating on a highest and best use, which is different than the ag use proposed in their Plan. *Foster*, 79 B.R. at 908-09.

Debtors argue that both Gourley's and Urick's appraisals include value for recreational use, and that they intend to use the Home Place solely for ag use. They admit that they have leased hunting rights in the past, but argue that they leased out other parcels which they are surrendering and they have no interest in leasing hunting rights on the Home Place.

Debtors contend that Urick's appraisal is outdated since he prepared it in February 2012, and that he disregarded a more recent comparable sale. Debtors submit that Michael's and Korkow's testimony support a $304.09 per acre valuation of the Home Place under the Income Approach. Debtors request that the Court use Urick's formula for the Income Approach and Gourley's use of comparable Sale 1 and value the Home Place at $450 per acre, or $352,687.50.

State Bank argues for a valuation of the Home Place in the amount of $801,556.25[19] calculated from Urick's appraisal, Ex. KK. The Bank urges the Court to disregard Korkow's valuation calculated by means of the Income Approach because of inconsistencies in the number of cattle Debtors intend to carry, Korkow's inexperience in valuing property and the fact that he is not an appraiser. The Bank contends that both Gourley's and Urick's appraisals considered the Debtors' ag use, access problems, and other deficiencies in arriving at their appraised values, and

---

[19]The difference between State Bank's calculation of the Home Place from Urick's testimony is $160.90, and can be attributed to cents and fractions of a percentage which the Court included and State Bank did not. The Court will use State Bank's $801,556.25 amount.

17

that they considered the same comparable sales.  The Bank argues, however, that Gourley's

$800/acre price has no support in the record.

State Bank cites *In re Taffi*, 96 F.3d 1190 (9th Cir. 1996), *cert. denied*, 521 U.S. 1103, 117

S.Ct. 2478, 138 L.Ed.2d 987 (1997), for the proposition that the proper valuation under § 506(a)

is the fair market value when the property is to be retained by the debtor, and argues that the

Gourley and Urick appraisals are based on fair market value.  State Bank also cites the United

States Supreme Court decision in a chapter 13 case, *Associates Commercial Corp v. Rash*, 520

U.S. 953, 962, 965, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), which held that the proposed

disposition or use of collateral is of paramount importance to valuation, and that the replacement

value standard is the appropriate measure of value.  State Bank then cites *In re McElwee*, 449

B.R. 669 (Bankr. M.D. Pa. 2011), a chapter 12 case which in turn surveys chapter 12 cases and

adopted a *Rash* approach to value, wherein the proper method for valuing property which a

debtor will retain must consider the debtor's current and prospective use of the property, but

under *Rash* the replacement value is equivalent to fair market value, or the value a willing

purchaser in the debtor's business would pay for a like property.  449 B.R. at 671, 672, citing *In

re Watkins*, 240 B.R. 735 (Bankr. C.D. Ill. 1999), *In re Bishop*, 339 B.R. 595 (Bankr. D. S.C.

2005), and *In re Brace*, 163 B.R. 274 (Bankr. W.D. Pa. 1994).

The Bank states that the Gourley and Urick appraisals are based on fair market value, and

based on agricultural use.  The Bank disagrees with Debtors' argument that Gourley's and

Urick's consideration of non-agricultural amenities make their appraisals incorrect, and that the

non-ag amenities are not different uses but rather are simply factors that are part of the value of

the Home Place.  The Bank argues that Debtors' proposed continued use of the Home Place

18

mean that their alleged problems of access and water will not exist for Debtors since they are already dealing with them.

The Bank asserts that Urick's appraisal is better than Gourley's because Gourley did not give enough weight to properties which were most similar to the Home Place, and because Gourley did not use all three approaches to valuation to check his conclusion. The Bank urges the Court to value the Home Place at $801,556.25.

## II.  § 506(a).

Debtors' Motion for Valuation is based upon § 506(a).  Section 506(a)(1) provides:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

*In re Enewally*, 368 F.3d 1165, 1168 n.1 (9th Cir. 2004).

A leading commentator explains that "§ 506(a) embraces a degree of flexibility by explicitly directing no more than that the court must consider the purpose of the valuation and the proposed disposition or use of the collateral in question."  4 Alan N. Resnick, Henry J. Sommer, COLLIER ON BANKRUPTCY, ¶ 506.03[4][a][iii] ("Recognition of Rights and Avoidance of Windfalls") (16th ed. 2009).

Section 506(a) provides that a claim is secured only to the extent of the value of the property on which the lien is fixed, while the remainder is considered unsecured.  *In re Stratton*,

19

248 B.R. 177, 180 (Bankr. D. Mont. 2000); *United States v. Ron Pair Enterprises*, 489 U.S. 235,

239, 109 S.Ct. 1026, 2029, 103 L.Ed.2d 290, 297 (1989).  The second sentence of § 506(a)

provides that "valuation is to be done variously depending on the context, in light of two factors,

the purpose of the valuation and the use or disposition to be made of the interest."  *Taffi*, 96 F.3d

at 1192.

Debtors argue that *Robinson* and *Foster* require that this Court value the Home Place

based solely on the ag use they propose in their Plan.  In *Foster* this Court rejected a creditor's

appraisal of debtors' agricultural land which the appraiser valued for use as subdivision tracts.

79 B.R. at 908.  In the instant case neither Gourley nor Urick valued the Home Place as a

subdivision tract.  On the contrary both appraisals state that the highest and best use of the Home

Place is as an agricultural tract.  Gourley described the highest and best use as "an add-on/part

time agricultural tract, recognizing there are nonagricultural amenities included in the subject

property that may affect value and enlarge the pool of buyers."  Ex. 1, p. 38.  Urick described the

highest and best use as "Livestock grazing and dryland cropland with some positive recreational

influence."  Ex. KK, p. 37.  Both Ex. 1 and KK clearly value the Home Place based upon ag use,

and therefore *Foster* is no support for the Court to disregard their appraisals.

This Court specifically stated in *Robinson*:  "In Chapter 12 cases where the property will

be held as a going-concern for the production of income to pay reinstated mortgages and

subsequent debts, the value under 11 U.S.C. § 506(a) should be based on a fair market value, not

a liquidating value."  75 B.R. at 608 (citing cases); *see also In re Case*, 115 B.R. 666, 669 (9th

Cir. BAP 1990).  The ensuing years have not changed this Court's rule.  As noted in *Stratton*,

"the *Rash* standard is used synonymously with the Ninth Circuit's understanding of the term fair

20

market value." *Stratton*, 248 B.R. at 182, quoting *Rash*, 520 U.S. at 959 n.2, 117 S.Ct. at 1884, and *Taffi*, 96 F.3d at 1191-92. *Taffi* stated: "The fair market value is the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." 96 F.3d at 1192. Gourley defined his Market Value in comparable terms at p. 10 of Ex. 1. So did Urick at page 17 of Ex. KK.

Debtors ask the Court to reject their own appraisal, and the Bank's appraisal, because the appraisals acknowledge "some positive recreational influence" or recognize "there are nonagricultural amenities included in the subject property that may affect value and enlarge the pool of buyers." Ex. KK, p. 1; Ex. 1, p. 7. First of all, Debtors offered Gourley's appraisal, Ex. 1, into evidence. The Court is puzzled why they offered it if they wished it to be disregarded. Second, both appraisals are based on agricultural use of the Home Place which Debtors intend to pursue, acknowledging the recreational or nonagricultural amenities only because they exist and are appropriate to include in determining fair market value under the rules of their profession.

Third, Debtors seek a lower valuation of the Home Place by reducing the value of the recreational or non-ag uses, from which the evidence shows they have profited in the past. Debtors leased out their land to hunters, and the potential remains for the Home Place even though Michael insists they will not lease to hunters in the future. To reduce the valuation of the Home Place by removing recreational influences would require the Court to disregard the consistent professional opinion of both certified appraisers, and would amount to a windfall for the Debtors which COLLIER warns should be avoided:

> [A] rule that permitted the debtor to retain the collateral without compensating the

secured creditor in full for the value of the collateral that the creditor is prevented from reaching might often amount to a windfall to the debtor and other creditors and might create an incentive for other creditors to use the bankruptcy process merely to obtain value from the secured creditor. Such a rule might also increase the cost and reduce the availability of secured credit.

COLLIER, ¶ 506.03[4][a][iii].

### III. Value of the Home Place.

Turning first to Michael's value testimony, the Court has explained:

While a debtor's estimate of value may be acceptable in certain cases, the Court may give little weight to the opinion if not based upon sufficient facts. *In re Schenk*, 67 B.R. 137, 140 (Bankr.Mont.1986). The determination of the weight to be given expert testimony or evidence is a matter within the discretion of the trier of fact—which in a nonjury proceeding like the instant case is the bankruptcy court. *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir.1990), Arkwright *Mutual Insurance Co. v. Gwinner Oil Inc.*, 125 F.3d 1176, 1183 (8th Cir.1997); Barry Russell, *Bankruptcy Evidence Manual*, 2000 Ed., § 702.2. In this contested matter, the trial court acts as a factfinder as well as a gatekeeper. In such instances the court's discretion includes the weight to be accorded to the evidence. 4 Joseph M. McLaughlin, *Weinstein's Federal Evidence* § 702.05[2][a] (2nd ed.2000).

*In re Schmitt*, 20 Mont. B.R. 57, 75 (Bankr. D. Mont. 2002).

Michael testified that in his opinion the Home Place has a value of from $400 to $500 per acre, and Debtors request that the Court fix the value at $450 per acre. While an owner, Michael has no professional experience in real estate nor education in the valuation of agricultural property. His opinion is based on the condition of his property due to his neglect or lack of funds to maintain. The evidence includes appraisals prepared by two licensed, certified appraisers with decades of experience in valuing Montana agricultural properties. Therefore, the Court assigns little weight to Michael's value testimony.

The Court assigns less weight to Korkow's opinion. Debtors did not employ Korkow to appraise their real estate. He is not licensed, certified or otherwise qualified in Montana to

22

perform real estate valuations.  He admitted that he has not taken any valuation classes for 20 years, while Urick testified that he is required to take 39 hours of continuing education classes every 2 years.

Korkow's valuation is based on the Income Approach, which he performed using figures provided by the Debtors, and Urick's capitalization rate.  He admitted that if the figures were wrong his result would be wrong.  Urick testified that he placed the least emphasis on the Income Approach in his appraisal of the Home Place.  Gourley states in Ex. 1 at pp. 61-62 that the Income Approach would be inconclusive and even misleading in the appraisal of the Home Place because of its below average condition.  Korkow's value opinion is based on the least reliable approach[20], calculated using disputed cattle numbers, and performed by a person who admits that his qualifications have lapsed.

Finally, Debtors do not agree with Korkow's opinion.  Korkow calculated the value of the Home Place at $304.09 per acre, according to their brief at p. 4, while Debtors ask the Court to value the Home Place at $450 per acre.  The Court gives Korkow's testimony no weight.

As between the expert opinions of Gourley and Urick, as this Court wrote in *Robinson Ranch*:  "The appraisers have credibility, and as is usual in valuation of property, the differences are based on an honest difference of opinion as to the value."  75 B.R. at 610.  There, the Court concluded that a valuation which represented a continuum between the land values was appropriate.  *Id.*

---

[20]The Court notes that the income approach was used by experts in *Robinson Ranch*, because at the time the market for agricultural land was so adverse that there were few comparable sales which were not outdated.  75 B.R. at 609.  In the instant case both expert appraisers were able to find recent comparable sales.

Gourley valued the Home Place at $800 per acre, while Urick valued Tract 1 at $1,075 per acre and Tract 2 at $600 because of access.  The Court will not split the difference, because the Court considers Gourley's experience as a real estate broker in the sale of agricultural properties entitles his opinion to additional weight.  In particular, a fair market value of Tract 1 must account for the access problems inherent if the property were sold without the Debtors' homesite, which the evidence shows is not part of the Home Place.  In that event the Home Place would also lose the Site's well.  Urick recognized this as well, but the Court believes that Gourley is better placed to reconcile those problems in the valuation.  On the other hand the Court believes that Urick's appraised value cannot be disregarded.

Gourley's valuation of the Home Place is $627,000, while State Bank's calculation of Urick's valuation of the Home Place is $801,556.25.  After weighing the evidence and consideration of applicable authority, this Court finds, concludes, and fixes the value of the Home Place in the amount of $650,000.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above granting Debtors' Motion for Valuation of State Bank's security in part and denying it in part, and fixing the value of the Home Place at the amount of $650,000, or $829.35 per acre.

BY THE COURT

_Ralph B Kirscher_

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

24

25